## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JOHN E. GLEASON,**                          **CASE NO. 2:08-cv-969**
                                              **CRIM. NO. 2:05-cr-178**
                                              **JUDGE MARBLEY**
                          **Petitioner,**     **MAGISTRATE JUDGE KEMP**

**v.**

**UNITED STATES OF AMERICA,**

                          **Respondent.**

### REPORT AND RECOMMENDATION

Petitioner, a federal prisoner, brings the instant motion to vacate, set aside or correct

sentence pursuant to 28 U.S.C. §2255. This matter is before the Court on the instant

petition, respondent's return of writ, petitioner's reply and the exhibits of the parties. For

the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be

**DISMISSED.** Petitioner's request for an evidentiary hearing is **DENIED.**

### FACTS and PROCEDURAL HISTORY

The United States Court of Appeals for the Sixth Circuit summarized the facts and

procedural history of this case as follows:

> Beginning on May 11, 2005, Gleason engaged in internet chats
> with an individual using the screen name "gwenoh" who
> claimed to be a fourteen-year-old girl from Columbus, Ohio,
> but who was in fact a Detective in the Dublin, Ohio Police
> Department. In their chats, Gleason described himself as a
> thirty-seven-year-old soldier in the Army, discussed various
> sexual activities, explained that because he had a vasectomy
> they could have sex without her becoming pregnant, and
> provided his phone number. A female employee of the Dublin
> Police Department called the provided number and confirmed

plans to meet on May 27 at a park in Dublin, Ohio, and Gleason mentioned that he could bring some "Blackberry Merlot" wine. Joint Appendix ("J.A.") at 11 (Aff. in Support of Complaint at 3). On May 27, 2005, Gleason was arrested in Dublin after traveling to the specified park from Ft. Knox, Kentucky.

On May 31, 2005, Gleason was released on house arrest with electronic monitoring. Gleason, then a 49 year-old active-duty Sergeant First Class in the United States Army, was stationed at Ft. Knox, Kentucky, and his Bond Order required him to remain on the military base in Kentucky (except for court appearances or meetings with counsel), to report frequently to Pretrial Services, to refrain from using computers or accessing the internet. Gleason also agreed to pay for the costs of the electronic monitoring if he was financially able to do so after supporting his family. In May 2005, Gleason was married with two male children, ages sixteen and ten, who resided with their mother in Bowling Green, Ohio. Although stationed in Kentucky, Gleason considered Bowling Green his residence.

Investigation into Gleason revealed that he had previously chatted online with other female minors, discussed sexual activities with them, and offered to meet some of them. Gleason's computer contained images of nude or partially nude female minors, and a few images depicted underage females engaging in sexual acts. Gleason explained that his online correspondence with young girls began as a fantasy but became too real and that "it started as something to do, while he was away from his family serving in the Army." J.A. at 157 (Presentence Investigation Report ("PSR") at ¶ 27, 25). According to testimony presented at Gleason's sentencing hearing by Special Agent James Olmstead of the Defense Criminal Investigative Service of the Department of Defense, on two occasions Gleason had previously traveled to Akron, Ohio, to meet a girl who claimed to be nineteen years old but was in fact sixteen or seventeen years old. The two had been communicating "for a couple of years." J.A. at 91 (Sent. Hr'g Tr. at 25).

In August 2005, a grand jury indicted Gleason on two counts,

the first count charging Gleason with traveling in interstate commerce with intent to engage in illicit sexual conduct with a minor in violation of 18 U.S.C. § 2423(b), and the second count seeking forfeiture of certain facilitating equipment, such as Gleason's computer and cellular phone, pursuant to 18 U.S.C. § 2253(a)(3). Gleason pleaded not guilty, and the district court set January 23, 2006, as the trial date.

On January 23, 2006, Gleason changed his plea and pleaded guilty to the first count in the indictment pursuant to a plea agreement and agreed to the forfeiture in the second count. At the change-of-plea hearing, the parties agreed to schedule the sentencing for sometime after July 31, 2006, so that Gleason could retire from the Army and so that his family could receive his retirement benefits. During this time, Gleason remained free on his original bond conditions.

In February 2006, the Probation Office completed Gleason's PSR. Using the 2005 edition of the United States Sentencing Commission Guidelines Manual, the probation officer arrived at a Total Offense Level of 23 for Gleason. An offense level of 23 combined with Gleason's criminal history category of I produced a Guidelines range of 46 to 57 months in prison. The probation officer recommended a sentence of 46 months, the bottom of the Guidelines range, because Gleason "has no prior record of arrest and has a good record of military service." J.A. at 166 (Sentencing Recommendation).

As of October 2006, the district court had not set a date for sentencing. On October 24, 2006, pre-trial services sought an arrest warrant for Gleason based on alleged bond violations regarding Gleason leaving his home without permission on the night of October 13 and lying twice about his activities on that night. Two days later, on October 26, the district court set a sentencing date for the morning of November 8, 2006. On October 31, 2006, a magistrate judge issued notice of a proceeding related to Gleason's alleged bond violation scheduled for the afternoon of November 8.

On November 2, 2006, Gleason filed a sentencing memorandum in which he argued for a sentence lower than

the 46 months recommended by the Probation Office. Gleason argued that his "offense did not involve a victim," J.A. at 40-41 (Def.'s Sent. Mem. at 4-5), he was unlikely to be a recidivist, he had a good employment record with the U.S. military, and the seventeen months he had spent on home detention since his arrest constituted some measure of punishment already.

On November 6, the Government filed a sentencing memorandum in which it argued against any sentence lower than the Guidelines range. The government highlighted aspects of Gleason's conversation with the undercover officer, the images of nude teen and underage girls on his computer that it claimed "were actually child pornography," J.A. at 48 (Gov't Sent. Mem. at 3), and that Gleason had previously met a minor whom he had contacted on the internet. The government also detailed "Gleason's extraordinarily poor behavior while on bond," J.A. at 51 (Gov't Sent. Mem. at 6), which included spending the night of October 13, 2006, off base with a woman "he met through an expensive phone based 'dating' service and with whom he had communicated on the Internet with the help of his friends," and lying "several times to his pre-trial services officer about the incident," J.A. at 50 (Gov't Sent. Mem. at 5). The government also pointed out that although Gleason's bond order committed him to paying for the cost of his electronic monitoring, he had only paid $100 toward that cost while paying approximately $300 per month to a telephone dating service.

In its sentencing memorandum, the government did not specifically request an upward variance, but the government did observe that "extraordinarily bad behavior after the offense should be considered as a basis of an upward departure." J.A. at 50 (Gov't Sent. Mem. at 5). Further, after noting Gleason's "total disrespect of his bond conditions," the government argued that his sentence "should not merely be at the upper end of the guideline range, it should also include a longer period of supervised release than the three years recommended" by the probation officer. J.A. at 51-52 (Gov't Sent. Mem. at 6-7). As a result, the government "recommend[ed] a sentence at the high end of the guideline range [of 46 to 57 months] and at least five years of supervised

release." J.A. at 53 (Gov't Sent. Mem. at 8).

At the sentencing hearing, the government presented testimony from Jennifer Chadwick, a pre-trial services officer, regarding her reports on Gleason's alleged bond violation. Special Agent James Olmstead of the Defense Criminal Investigative Service of the Department of Defense also testified, describing Gleason's prior online communication with a minor from Akron, whom he traveled to meet and groped in his car. Olmstead testified about Gleason using his friends and his son to send and receive emails to a thirty-two-year-old woman whom he had met using a telephone dating service.

Gleason's attorney cross-examined both government witnesses and established that no evidence showed that Gleason had contacted or communicated with any underage girls while on bond. Gleason then testified that he never had sexual intercourse with any person under eighteen years of age, that he took "full responsibility" for his bond violations, and that he had "panicked and lied" to his pre-trial services officer when confronted about his avoidance of electronic monitoring in October. J.A. at 113 (Sent. Hr'g Tr. at 47).

After verifying that Gleason had no objections to the PSR and that he had received it at least ten days in advance of the hearing and reviewed it with his attorney, the district court found that "under the applicable advisory guidelines, the total offense level is 23." J.A. at 115 (Sent. Hr'g Tr. at 49). The district court then invited Gleason's attorney to argue for a lower sentence under the factors contained in 18 U.S.C. § 3553(a). *Id.* Gleason's attorney outlined the arguments made in his sentencing memorandum, and in response the district court explained why those arguments were troublesome. The district court disputed that the offense did not involve a victim and suggested that Gleason's post-offense contact-contacting younger women through a telephone dating service and enlisting the assistance of his friends and son to communicate with women over the internet-indicated that recidivism was a risk for Gleason.

The district court then sought the government's views on the § 3553(a) factors, and after hearing the government's statement, the district court asked "why under all of these circumstances [relating to the bond violations] you have not sought an upward departure, and is there any basis for an upward departure in this case?" J.A. at 123, 121-23 (Sent. Hr'g Tr. at 57, 55-57). Counsel for the government described "struggl[ing] with this" case and noted that the government's sentencing memorandum had sought "a longer term of supervised release [than that recommended by the probation officer] to make sure that [Gleason] gets it, because I don't think now he gets it." J.A. at 123 (Sent. Hr'g Tr. at 57).

The district court then asked again whether "there's a basis for an upward departure in this case" and the government responded that "[b]ased upon the bond violations ... I think that there could be a foundation for an upward departure in this case." *Id*. The district court recited the considerations listed in § 3553(a)(2), and the government specifically pointed to the need to "protect the public from further crimes of the defendant" in § 3553(a)(2)(C). J.A. at 124 (Sent. Hr'g Tr. at 58). Given uncontested evidence in the PSR regarding Gleason groping a sixteen-year-old girl, the attorney for the government mentioned being concerned by the phrasing of the question that Gleason's attorney asked Gleason regarding whether Gleason had ever had "sexual intercourse" with a minor. *Id*. The district court queried why the government did not ask Gleason a follow-up question, and the government's attorney replied that "I didn't want to embarrass Mr. Gleason on the stand." J.A. at 125 (Sent. Hr'g Tr. at 59). The district court replied that "[i]f what he's done hasn't embarrassed him already, I don't know that anything would" and that "I would have not thought that you would have told me that you didn't ask someone accused and convicted who has pled guilty of this crime that you didn't ask the question because you didn't want to embarrass him." *Id*. Gleason's attorney then explained that he phrased his question to differentiate sexual intercourse from sexual contact, which apparently Gleason did not dispute occurred when he traveled to Akron to meet the sixteen-or seventeen-year old girl. J.A. at 126-27 (Sent. Hr'g Tr. at 60-61).

The district court then expressed "concern about the offense level in this case" and suggested that Gleason's case might be "appropriate for an upward departure" because the court was unsure "whether [Gleason's] post-offense behavior shows respect for the law or whether his post-offense behavior convinces me that this sentence adequately protects the public from further crimes of the defendant." J.A. at 127-28 (Sent. Hr'g Tr. at 61-62). The district court also queried whether "a sentence of 46 to 57 months will afford adequate deterrence" and stated a belief that "the testimony of [the government's witnesses] lead[s] me to believe that this case is a candidate for an upward departure because [ ] it appears to me that Mr. Gleason was continuing the same pattern that led to this underlying offense." J.A. at 128 (Sent. Hr'g Tr. at 62). Noting that "I have certainly departed downward when people have shown extraordinary post-offense or post-conviction rehabilitation," the district court suggested that an increased sentence might be appropriate "if someone displayed behavior that was inconsistent with any type of-not remorse so much as respect for the law or understanding of what he had done and the consequences of what he had done in the first instance." J.A. at 129 (Sent. Hr'g Tr. at 63).

At this point, the district court announced that "I disagree with the U.S. attorney that [the recommended sentence] is adequate in light of my analysis of §3553(a)(2)(A), (B) and (C)" and stated that Gleason deserved a greater sentence in the range of 63 to 78 months. FN1 J.A. at 129-30 (Sent. Hr'g Tr. at 63-64). The district court then invited comment from both Gleason's attorney and the government, as well as an allocution from Gleason. Gleason's attorney did not object to the lack of notice that the district court was considering a sentence above the recommended guideline range in the PSR.

FN1. Although the district court described the sentence using the term "upward departure," J.A. at 129 (Sent. Hr'g Tr. at 63), the district court's analysis focused on the § 3553(a) factors, and both Gleason and the government have treated the sentence as a variance, and not a departure. *See, e.g., United States v. Cousins*, 469 F.3d 572, 577 (6th Cir.2006) (explaining that sentences outside the Guidelines based on the § 3553(a) factors

are "variances" or "Non-Guideline departures," whereas sentences outside the Guidelines based on Chapter 5 of the Guidelines are "departures" or "Guideline departures").

Gleason began his allocution by expressing remorse over his attempted meeting with an underage girl and stated that in his telephone dating activities he had "scrupulously avoided any kind of contact" with underage girls and that his telephone dating activities began only after his wife filed for divorce in August 2006. J.A. at 131-32 (Sent. Hr'g Tr. at 65-66). The district court interrupted and expressed concern that, because Gleason had reacted to a crisis like his wife's filing for divorce by going outside the law and obligations of his bond order, with Gleason's "history, your next step would be to go outside the letter of the law because you seem to have a penchant for underage young ladies." J.A. at 132 (Sent. Hr'g Tr. at 66). The district court continued, stating that "my view of [your offense] is that that's the most heinous of crimes," elaborating that "when someone of your age and maturity decides to deprive someone like a 14 year old of their innocence, to me that's a heinous crime, and there's very little worse in my view that you can do." J.A. at 132-33 (Sent. Hr'g Tr. at 66-67). Stating that "I'm not concerned about whether you would be embarrassed on the stand because no one was concerned about whether the 14 year old girl was going to be robbed of her youth," the district court then remarked that "if no one else protects those children, I will. So that's why I believe, in addition to the factors that I outlined, that this is a heinous offense, and that's why I have a real concern because of your post-conviction behavior that you can easily lapse back into that behavior." J.A. at 133-34 (Sent. Hr'g Tr. at 67-68). The district court then asked Gleason to continue with his allocution, and Gleason simply asked for the court's mercy.

Prior to announcing Gleason's sentence, the district court stated that "counsel will have a final opportunity to make any legal objections before the sentence actually is imposed." J.A. at 135 (Sent. Hr'g Tr. at 69). The district court then announced Gleason's sentence of seventy-eight months of imprisonment. J.A. at 135 (Sent. Hr'g Tr. at 69). After stating the sentence, the district court asked "[i]s there any objection to the sentence as

stated." J.A. at 138 (Sent. Hr'g Tr. at 72). Gleason's attorney asked "the Court to note my objection to the Court's upward departure." *Id*. The government requested the court to clarify any findings it made in imposing the sentence, and the district court stated that "I accepted the factual statements set forth not only in the PSI but also based on the testimony" of the government witnesses. J.A. at 140-41 (Sent. Hr'g Tr. at 74-75).

On December 8, 2006, Gleason filed a motion for reconsideration of the sentence. Gleason asked the district court to "consider reducing [the] term of imprisonment to 57 months, which is at the high end of [Gleason's] acknowledged Sentencing Guideline range of 46 to 57 months ... and which was originally requested by the Government." J.A. at 54 (Mot. to Reconsider Sent. at 1). Gleason acknowledged that "violat[ing] the Court's trust by disregarding the terms of his release" meant that he "may no longer merit much consideration for a downward departure." J.A. at 55 (Mot. to Reconsider Sent. at 2). Gleason also stated that his "counsel was provided with no notice to indicate that the Court was even considering an upward departure." J.A. at 56 (Mot. to Reconsider Sent. at 3). Gleason then filed his notice of appeal on January 3, 2007. Finally, on February 22, 2007, the district court filed the Judgment in this case, the final page of which was a Statement of Reasons explaining the sentence imposed.

In the Statement of Reasons, the district court wrote that "[t]he Court adopts the factual findings in the Advisory Guidelines Application in the Presentence Report except that the Court finds that pursuant to the factors set forth in 18 U.S.C. §3550(a) [sic], this case is appropriate for an upward departure from the Advisory Guidelines Range." J.A. at 170 (Judgment at 7). The district court then summarized the reasons stated at the hearing, stating that "while awaiting sentencing, [Gleason] left the military base on which he was required to remain, removed his monitoring device so that his locations could not be monitored, lied to sentencing officials, and used a telephone/internet chat room to meet a woman." *Id.* The district court then "conclude[d] that the Advisory Guideline Range is inadequate to promote in this defendant a respect for the law and to provide this defendant with just punishment for

the offense." *Id.* (emphasis added).

*United States v. Gleason,* 277 Fed.Appx. 536, unpublished, 2008 WL 1976606 (6th Cir. May 5,

2008). Petitioner filed an appeal, in which he asserted the following claims:

> First, Gleason argues that the district court failed to comply
> with Rule 32(h) of the Federal Rules of Criminal Procedure and
> provide notice that it was considering an upward variance.
> Second, Gleason contends that his seventy-eight-month
> sentence, which exceeds the applicable Guidelines range, is
> substantively unreasonable.

*Id.* On May 5, 2008, the United States Court of Appeals for the Sixth Circuit affirmed

petitioner's sentence. *Id.*

On October 15, 2008, petitioner filed the instant motion to vacate, set aside or correct

sentence pursuant to 28 U.S.C. §2255. He asserts that he was denied the effective assistance

of counsel in pre-plea, plea, post-plea and sentencing stages. Petitioner asserts that the

District Court sentenced him above his recommended guideline sentence "and well in

excess of a sentence reasonably required to satisfy the provisions of 18 U.S.C. §3553" due

to the ineffective assistance of counsel. *Petition*, at 2. It is the position of the respondent

that petitioner's claim is without merit.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner asserts that, as a result of his attorney's deficient performance, he had no

choice but to enter a guilty plea. *Petition*, at 8. He complains that his attorney failed to

discuss with him or consider the defense of entrapment; failed to hire an investigator or

seek the appointment of an expert to review computer messaging and images on

petitioner's computer; and failed to assist him in obtaining a psychological evaluation and counseling. Additionally, petitioner complains that defense counsel mislead him regarding the consequences of his guilty plea by advising him that "he would receive a sentence of two or three years at a minimum security camp." *Id.*, at 5. Petitioner complains that his attorney provided ineffective assistance at sentencing.

In support of these allegations, petitioner has submitted his own affidavit, which indicates in relevant part as follows:

> The performance, or failure of performance, of Attorney Kaps which I allege to be deficient includes, but is not limited to the following:
>
> a. From the time of the filing of the criminal complaint in May 27, 2005 until my arraignment on the Indictment on August 29, 2005, Attorney Kaps met with me only three times and never discussed a defense to the charges;
>
> b. Following my arraignment I advised Attorney Kaps of an alternative reason for my travel to Ohio on the day of my arrest and he agreed to seek an order to retain an expert investigator to secure helpful testimony in that regard;
>
> c. From the time of his appointment as my attorney I advised Attorney Kaps that I had no available funds to assist in my defense or to retain expert testimony;
>
> d. On September 2, 2005, Attorney Kaps filed a Motion to Retain an Investigator and on November 17, 2005 this Court granted that motion and authorized investigative services in an amount not to exceed $3,500. No expert investigative evidence was ever produced or presented;
>
> e. From our earliest conversations I advised Attorney Kaps that I was concerned about my behavior and wanted to obtain a psychological evaluation with recommendations for

counseling;

f.   Despite being Court appointed and having obtained an order for investigative services, Attorney Kaps initially refused to request an expert psychological evaluation and repeatedly told me I would have to raise $2,400 for those purposes and pay the travel and lodging expenses for this expert, all of which I was unable to do;

g.   Finally on January 23, 2006, the day I entered my guilty plea, Attorney Kaps filed a Motion to Retain Expert Services, but for a *psychiatric*, not a psychological evaluation;

h.   Attorney Kaps then failed to pursue this motion and on April 27, 2006, without notice or explanation to me, Attorney Kaps filed a notice of withdrawal of the motion to obtain these expert services;

i.   As a direct result of the foregoing, I did not obtain psychological evaluation nor did I obtain any recommendations for counseling, all of which would have been helpful to the Court at sentencing and would have assisted me in my conduct and decision-making during my seventeen months of house arrest while awaiting sentencing;

j.   In early January 2006, Attorney Kaps called me and told me to be ready to enter a guilty plea.  He advised I would receive a sentence of two or three years to be served at a minimum security camp.  It was not until after I was sentenced that I learned the offense of conviction was a crime of violence thus making me ineligible for placement at a minimum security camp;

k.   After entering my guilty plea I had virtually no communication with Attorney Kaps except for his continued insistence that I raise the money necessary for a psychological evaluation, which I was unable to do;

l.   In preparation for sentencing, I provided Attorney Kaps with an NCO Military evaluation which recognized my outstanding military service, a copy of which is attached hereto

as Exhibit 1 and incorporated by reference[] herein. Attorney Kaps failed to provide this document to the Court for consideration at sentencing;

m. In late October 2006, I was notified of a pretrial release violation and on October 26, 2006 I was taken into custody and a hearing was set on the violation for November 8, 2006. The Court then set sentencing for the same date;

n. Despite the short notice, the uncertainty of information to be presented at the hearing and the risk of prejudice to sentencing, Attorney Kaps failed to request a separate hearing for sentencing;

o. As preparation for the violation hearing and sentencing Attorney Kaps met with me for a total of ten minutes at the jail where I was being held. He did not advise that the government would be presenting witnesses and he did not prepare me for either hearing nor did he suggest any witnesses or exhibits to be presented on my behalf;

p. Attorney Kaps never advised that any conduct unrelated to the offense of conviction would be presented or disputed at sentencing nor did he advise that the government would be presenting testimony regarding images found on my computer;

q. Attorney Kaps never advised we should obtain expert testimony to confirm that there were no images of juveniles on my computer;

r. Attorney Kaps never advised that we should subpoena Pretrial Release Officer Spoelker so he could confirm that during the 13,000 hours of electronic monitoring there were only 7 hours unaccounted for; and that I was working 70 to 80 hours per week during the seventeen months of monitoring with only 6 weekend passes out of the 70 weekends in question;

s. Attorney Kaps failed to advise this Court that I only subscribed to the phone dating service during the last three

months of the seventeen months of monitoring and only after my wife had introduced her new boyfriend to my children;

t. Attorney Kaps failed to prepare himself or me for the violation hearing or for sentencing;

u. Because Attorney Kaps failed to obtain an order for psychological evaluation and counseling he was unable to provide expert testimony at sentencing to help explain my conduct or assist the Court in evaluating the statutory sentencing factors;

v. Attorney Kaps failed to advise the Court of the unavailability of rehabilitative services in the Federal Prison System for sexual disorders as a basis for a shorter sentence followed by counseling while on supervised release, despite clear Sixth Circuit case law supporting this position;

w. Attorney Kaps failed to object to the lack of notice for upward departure and failed to make a record of the prejudice to me as result of the lack of notice.

Had Attorney Kaps properly prepared for sentencing... I believe the results at sentencing would have been different and I would have received a significantly lower sentence[.]

*Affidavit of John E. Gleason.* Petitioner also has submitted an affidavit from Rosemary

Wascak, his sister, which indicates in relevant part as follows:

During the seventeen months of my brother's electronic monitoring... I talked to my brother on numerous occasions , several times each month. During those conversations he advised me that Attorney Charles Kaps had been appointed to represent him;

In early January 2006, my brother told me Attorney Kaps told him to plead guilty and he would serve a sentence of approximately two years in a minimum security facility;

In the Summer of 2006, my brother told me Attorney Kaps had

filed a motion to obtain a psychological evaluation but had later withdrawn that motion and was insisting that my brother raise the money to retain a psychologist himself. My brother was unable to do this;

When my brother was arrested in late October, 2006, I called Attorney Kaps. He offered no suggestions to help and no plan for sentencing. He seemed ready to go along with the prosecutor's view of the case;

... Attorney Kaps made no request for any exhibits, evidence or testimonial witnesses, nor did he advise that the government would be calling witnesses and presenting evidence;

Following sentencing Attorney Kaps told me it was all my brother's fault and emphasized that the biggest problem was the failure to obtain a psychological evaluation, but then blamed my brother for this as well;

I asked Attorney Kaps why he did not present the positive NCO evaluation and he responded that the evaluation was useless since it was from a period more than six years ago. I pointed out that it was for the period from July 2006 through October 2006 and he then admitted he had misread the dates. As a result, the Court never received this report.

*Affidavit of Rosemary Wascak.*

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial,

a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 697. Because the petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

A prisoner may challenge the entry of a plea of guilty on the basis that counsel's ineffectiveness prevented the plea from being knowing and voluntary. *Tollett v. Henderson,* 411 U.S. 258, 267 (1973). The two part test announced in *Strickland v. Washington,* 466 U.S. 668, 687 (1984), applies to challenges to guilty pleas based on a claim of ineffective assistance of counsel. *Hill v. Lockhart,* 474 U.S. 52, 59 (1985); *Sparks v. Sowders,* 852 F.2d 882, 884 (6th Cir.1988). In order to obtain relief, a prisoner who is challenging the entry of his guilty plea on the basis of counsel ineffectiveness must first show that counsel's advice was not within the range of competence demanded of attorneys in criminal cases. *Hill,* 474 U.S.

at 59; *Sparks,* 852 F.2d at 884.

> The second, or "prejudice" requirement on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

*Hill,* 474 U.S. at 59; *Sparks*, 852 F.2d at 884.

Attorney Charles G. Kaps, petitioner's defense counsel, indicates that, after reviewing the evidence against petitioner, contacting a potential defense witness, and filing a motion for investigate funds to subpoena this potential defense witness, on December 29, 2005, he first discussed with petitioner in a face to face meeting the possibility of a guilty plea while preparing for trial scheduled January 23, 2006. *See Affidavit of Charles G. Kaps.*

> Discussions continued in a series of telephone conversations we had on January 7, 12, 16, & 19, 2006 and on the 19th of January, Gleason decided to change his plea.... His decision, with my concurring recommendation, was based on the following considerations.
>
> At the final pretrial on January 13, 2006, the Court informed us that it would deny my motion in limine, which sought to prevent the Government from introducing at trial, dozens of pictures taken from Gleason's computer, of naked girls who appeared to be very much underage (one of them also appeared to be masturbating herself.) Additionally, the Court indicated it would allow the Government to introduce transcripts of online "chat room" messages containing explicit sexual conversations between Gleason and other women, as well as the testimony of an underage girl from Akron, Ohio, who Gleason had visited and propositioned for sex several months earlier (none of which, Gleason denied).

Another inducement affecting Gleason's decision was a series of recorded cell phone conversations between Gleason and the police decoy that the Government also planned to use. To cite two examples:

a. "We could screw all weekend and you would never get pregnant." (Gleason, discussing his vasectomy in a 5/18/05 conversation, nine days prior to the meeting).

b. "You're going to have something short and sexy on...we'll go search for a room after I get you". (Gleason in a 5/26/05 conversation the evening before they were to meet).

Yet another inducement affecting his decision was my success... in securing an agreement with the Government and the Court to allow Gleason's to proffer his guilty plea and delay its acceptance and his sentence until after his retirement and termination from service, thereby avoiding a likely court martial and the forfeiture of his pension rights.

Gleason and I thoroughly discussed what his likely guideline sentencing range would be prior to his change of plea. At the time, I also mentioned that Judge Marbley had stated that he would take a close look at Gleason's pre sentence report and might even consider departing downward, but I cautioned Gleason that this was not a promise that the Judge would do so.

In a letter dated October 11, 2006, I mentioned to Gleason that voluntary surrender would likely warrant a minimum security classification, mistakenly concluding that this would likely make him eligible to serve time in a Federal Prison Camp, instead of a Correctional Institution. That mistake however, had no bearing on Gleason's decision to change his plea, inasmuch as it was made nine months afterward.

Gleason had a good PSR report. His guideline sentence range was 46 to 57 months. The report also recommended a 46 month sentence and voluntary surrender, because Gleason "has no prior record of arrest and has a good record of military service"[.] ... The report also "identified no information

> regarding the offense or offender that [might] warrant departure"[.]...
>
> My professional opinion, after considering the Government's evidence, witness interviews and my conversations with Gleason, is that he would have been convicted if he had chosen to have his case tried. A conviction would have increased Gleason's guideline sentencing range at least two levels higher (i.e. 57 to 71 months).

*Affidavit of Charles G. Kaps.*

On January 23, 2006, petitioner signed a guilty plea agreement indicating that he would be pleading guilty to traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, in violation of 18 U.S.C. §2423(b). Doc. No. 34. He understood he faced a maximum term of 30 years incarceration, a fine of $250,000, and supervised release for any term of years or life. He agreed not to contest the forfeiture of computer equipment and a cell phone. He understood that the District Court could impose any sentence within the statutory maximum and that no sentence had yet been determined. He understood that the United States Sentencing Guidelines would be considered, but were not mandatory. He understood that "any estimate of the probable sentencing range... [he] may have received from ... counsel, the United States, or the probation office, [was] a prediction, not a promise, and [was] not binding...." *Id.*, at 3. He indicated that no other promises had been made other than those set forth in his Guilty Plea Agreement. *Id.*, at 6.

At the time of his guilty plea, petitioner stated that he had discussed the charges against him, as well as all possible defenses with his attorney, and that he wanted to enter a guilty plea. *Guilty Plea Transcript*, at 3-4. He understood the nature and meaning of the

charges against him.  He had discussed with his attorney everything he knew about the case, and believed that his attorney was fully informed about the facts and circumstances involved.  *Id.*, at 6.  Counsel had fully advised him on the nature and meaning of the charge as well as any possible defenses.  He was satisfied with his attorney's advice and representation.  *Id.*, at 6-7.  The Court advised petitioner of the elements of the charge against him, as well as the maximum possible penalty of 30 years imprisonment that he faced.  Petitioner at all times indicated that he understood.  *Id.*, at 7.  He understood that the Court could impose the maximum penalty.  *Id.*, at 8.

> COURT: Do you understand that if I accept your plea of guilty, I can impose this maximum penalty?
>
> DEFENDANT: I do, Your Honor.
>
> COURT: Do you understand that if your plea of guilty is accepted, I can impose the same penalty as though you pleaded not guilty, stood trial and were convicted by a jury? Do you understand that?
>
> DEFENDANT: Yes, your Honor.

*Id.*, at 8-9.  He had discussed with his attorney how the advisory Sentencing Guidelines might apply in his case.  *Id.*, at 9.  The Court advised petitioner of all of the rights he was waiving by entry of his guilty plea.  Petitioner at all times indicated that he understood, and he did not ask any questions.  *Id.*, at 10-11.  The prosecutor summarized the terms of petitioner's guilty plea, and petitioner agreed with those terms.  *Id.*, at 11-15.  He denied that anyone had made any other promises or assurances of any kind to induce his guilty plea.  *Id.*, at 15.

> [COURT]: Mr. Gleason, aside from the plea agreement that we
> have just discussed, has any person, including any agent of the
> government or any of the attorneys in this case, promised or
> even suggested th[at] you will receive a lesser sentence or
> some other form of leniency in return for your plea of guilty?
>
> DEFENDANT: No, your Honor.

*Id.*, at 15. He denied being threatened or forced into entering his guilty plea. *Id.* Special

Agent James Olmstead summarized the facts of the case as follows:

> Starting on May 11, 2005, and continuing through May 27,
> 2005, John Edward Gleason of Ft. Knox, Kentucky, exchanged
> instant messages and spoke on the telephone with an
> undercover officer who he believed to be a 14 year old girl,
> known as Gwen. Gleason originally initiated the conversations
> with Gwen after seeing her Yahoo screen name in a teen chat
> room called "Young Girls for Older boyfriends." Gleason
> began sending her messages and using his computer which
> was located in Ft. Knox, Kentucky.
>
> Gleason and Gwen exchanged messages and telephone calls
> for a little over two weeks. During that time, Gleason
> discussed driving from Kentucky to Ohio in order to meet
> Gwen. Gleason discussed his plans to take Gwen to dinner,
> shopping, and to spend the night with her. Gleason
> specifically discussed his intention of having oral sex with
> Gwen, who he believed to be a minor being 14 years of age.
>
> On the evening of May 26, 2005, Gleason was observed by a
> U.S. Army investigator outside of his Ft. Knox, Kentucky
> residence. That evening Gleason told Gwen he would pick her
> up at the park first and then get a hotel room. On the morning
> of May 27, 2005, Gleason contacted Gwen and told her that he
> was leaving Ft. Knox and driving to meet her at Coffman Park
> in Dublin, Ohio.
>
> During the drive that morning, Gleason and Gwen had a
> phone conversation in which he expressed fear that he would
> be surrounded by police after she got into the car. He had

previously told Gwen to keep the meeting secret because he could get in a lot of trouble. Gleason left a voice message for Gwen that morning in which he said that he had arrived.

Gleason was arrested when his car pulled into the parking lot of Coffman Park in Dublin, Ohio, which is located in the Southern District of Ohio, and was across from their prearranged meeting place. He waived his rights and admitted to having the conversations, driving from Kentucky to meet Gwen. Gleason further admitted to having children 16 and 19 years of age; and, according to his driver's license, he was born on July 25, 1955.

*Id.*, at 17-18. Petitioner agreed with the truth of those facts, except that his children were

16 and 9. *Id.*, at 18. He admitted his guilt. *Id.*

It has long been settled as a general rule that where an adequate guilty plea hearing has been conducted, an erroneous prediction or assurance by defense counsel regarding the likely sentence does not constitute grounds for invalidating a guilty plea on grounds of ineffective assistance of counsel. See *Masciola v. United States,* 469 F.2d 1057, 1059 (3d Cir.1972) (citing *Wellnitz v. Page,* 420 F.2d 935 (10th Cir.1970)); *see also United States v. Marzgliano,* 588 F.2d 395, 399 n. 6 (3d Cir.1978) (explaining different rule where allegation is that plea was based on misconduct or misrepresentation by defense counsel); *United States v. Valenciano,* 495 F.2d 585, 588 (3d Cir.1974) (same). This rule has been reinforced with the advent of Guideline sentencing and the detailed procedures to be followed in conducting the Rule 11 colloquy at the guilty plea hearing. *See, e.g., United States v. Stephens,* 906 F.2d 251, 253 (6th Cir.1990) ("The mere fact that an attorney incorrectly estimates the sentence a defendant is likely to receive is not a 'fair and just' reason to allow withdrawal of a plea agreement.... This is especially true under the new Sentencing Guidelines.") (quoting *United States v. Sweeney,* 878 F.2d 68, 70 (2d Cir.1989) ("[The Sentencing Guidelines] reinforce our earlier decisions on the issue. Under the Guidelines there will be many more detailed hearings regarding imposition of sentence.")).

The rationale is that the Rule 11 colloquy, which advises the defendant of the minimum and maximum imprisonment range under the statute and provides other necessary information about the Guidelines sentencing process, eliminates any arguable prejudice from an earlier estimate by counsel. *See, e.g., United States v. Martinez,* 169 F.3d 1049, 1053 (7th Cir.1999) ("[A]n attorney's mere inaccurate prediction of sentence does not demonstrate the deficiency component of an ineffective assistance of counsel claim.") (citation omitted); *Gonzalez v. United States,* 33 F.3d 1047, 1051-53 (9th Cir.1994) ("The district court informed [defendant] of the maximum possible sentences and fines for the offenses to which he pleaded guilty. He responded affirmatively when asked if he was satisfied with [counsel]'s representation of him. As a result, [he] cannot claim he was prejudiced by [counsel]'s alleged gross error in calculating the sentencing guidelines range and likely sentence."); *Doganiere v. United States,* 914 F.2d 165, 168 (9th Cir.1990) ("[Defendant]'s attorney's inaccurate prediction of what sentence [he] would receive upon pleading guilty does not rise to the level of a gross mischaracterization of the likely outcome of his case, and thus does not constitute ineffective assistance of counsel.... Further, [defendant] suffered no prejudice from his attorney's prediction because, prior to accepting his guilty plea, the court explained that the discretion as to what the sentence would be remained entirely with the court.") (citation omitted).

*Brown v. United States,* 75 F.Supp.2d 345, 355 (D. New Jersey, 1999).

Therefore, regardless of whether defense counsel inaccurately predicted that petitioner may be housed in a minimum security facility, or told him that Judge Marbley might depart downward in his recommended guideline sentence, such predictions did not invalidate petitioner's guilty plea, or constitute the ineffective assistance of counsel, in view of petitioner's signed guilty plea agreement and transcript of his guilty plea colloquy. Further, the record reflects that the government's evidence against petitioner was strong,

and it appears that the government would have been able to prove the charges against him. By pleading guilty, petitioner obtained a two level reduction in his recommended sentence under the United States Sentencing Guidelines pursuant to §3E1.1(a) for his acceptance of responsibility, and a one level reduction pursuant to § 3E1.1(b) for timely notifying the authorities of his intention to enter a guilty plea. Had petitioner not subsequently violated the terms of his pre-trial release in the manner that he did (actions not reasonably anticipated by defense counsel), he would have substantially reduced his potential prison exposure as a result of his guilty plea. Petitioner's recommended sentence under the United States Sentencing Guidelines was 46-57 months incarceration, and the probation officer recommended that he be sentenced to 46 months plus three years supervised release. *See PreSentence Investigation Report.* The government agreed not to file any additional charges against petitioner based on the activities charged or occurring prior to the date of the indictment. *See Plea Agreement,* Doc. # 34. Moreover, defense counsel was able to delay entry of final judgment of conviction and sentence so that petitioner would obtain his military pension upon retirement. *See Final Pretrial Conference, January 13, 2006; PreSentence Investigation Report*, at ¶29.

Nothing in the record suggests that expert witnesses would have testified that there were, in fact, no pornographic images of juveniles on petitioner's computer. To the contrary, Special Agent James Olmstead testified at sentencing that he found numerous photographs or images attached to e-mail conversations sent to petitioner which included

girls who appeared to be under the age of 18. *Transcript,* November 8, 2006, at 19.[1]

Similarly, particularly in view of the facts admitted to by petitioner and evidence indicating that he had previously traveled in interstate commerce to meet an underage girl,[2] images on his computer, and his participation in chat rooms and e-mails with young individuals, the record does not reflect that counsel's failure to pursue the defense of entrapment constituted the ineffective assistance of counsel.

> In order to maintain an entrapment defense, a defendant must show "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct."

*Warwick v. United States,* 2005 WL 2740869 (E.D. Tenn. October 24, 2005), *quoting Mathews v. United States,* 485 U.S. 58, 62-63 (1988). The record does not appear to reflect such circumstances here. Moreover, petitioner indicated at his guilty plea hearing that he had discussed the charges as well as all of his possible defenses with his attorney and was satisfied with the representation of counsel.

> [T]he representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in

---

[1] Agent Olmstead opined that petitioner's e-mails contained images of girls who were under the age of 18, because he had a daughter who was 13 or under, "and also just prepubescent photos. I mean, no... pubic hair on... some of the girls" and "there were... photos of... girls... with bare breasts, or there wasn't much breast. I mean, it was more like a chest." *Transcript,* November 8, 2006, at 22.

[2] She had apparently told petitioner that she was 19 years old. *Transcript,* November 8, 2006, at 24-25.

any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Id.* at 74. Further, "[a] voluntary and unconditional guilty plea generally waives any non-jurisdictional claims that arose before the plea, including the defense of entrapment." *United States v. Cottage*, 307 F.3d 494, 499 (6th Cir. 2002), citing *United States v. Broce*, 488 U.S. 563, 569 (1989); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973).

In short, in view of the record, petitioner has failed to establish that, but for the ineffective performance of counsel, petitioner would not have entered a guilty plea, but would have proceeded to trial. *See Hill v. Lockhart, supra*.

Petitioner asserts that he "received woefully ineffective assistance" of counsel following entry of his guilty plea. He complains that his attorney failed to request a bifurcation of the bond violation and sentencing hearing, so as to "minimize the elements of surprise" and provide opportunity for rebuttal evidence. *Petition*, at 10. He complains that his attorney was unprepared at sentencing, failed to object or rebut hearsay statements from pre-trial services officer Jennifer Chadwick, who did not directly supervise petitioner's pretrial release, failed to subpoena David Spoelker, who directly supervised petitioner's pretrial release in Kentucky, failed to offer expert testimony to rebut testimony that he had sexually explicit images of minors on his computer, and failed to obtain a psychological evaluation or counseling services on petitioner's behalf for purposes of

mitigating evidence at sentencing. Petitioner complains that defense counsel improperly requested a psychiatric evaluation, instead of a psychological evaluation, and thereafter withdrew that request, improperly advising petitioner he had to pay $2,500 for a psychological report, and fund the expert witness' travel costs and expenses, although counsel knew that petitioner lacked the ability to obtain such funds. Lastly, petitioner complains that his attorney failed to submit his "NCO evaluation report," which would have provided mitigating evidence, and failed to advise the District Court at sentencing that petitioner only subscribed to a legal telephone chat line for the last three months of his seventeen month house arrest, and only after his wife had introduced her new boyfriend to his children. *Id.*, at 7. According to petitioner, the cumulative result of counsel's inadequate performance amounted to the denial of counsel at sentencing. *Id.*, at 11.

In support of this claim, petitioner has supplemented the record to include a copy of the *NCO Evaluation Report* he refers to, which indicates that, during the period of July 2006 to October 2006, petitioner served as a Garrison Commander at Fort Knox, Kentucky. His daily duties are listed as follows:

> Served as Operations NCO of the Fort Knox, Medical Retention Processing United supporting the Global War on Terrorism; responsible for scheduling and planning of transportation for the organization, vehicle maintenance, training of all company drivers, and keeping the Command informed of all vehicle and appointment scheduling conflicts.

*NCO Evaluation Report*, Doc. No. 80. This performance evaluation indicates that petitioner received positive ratings in all areas of his military performance during this time period.

He received an overall rating of "outstanding performance as a Operations Sergeant." *See id.*

Attorney Charles G. Kaps has responded to these allegations in relevant part as follows:

> On October 24, 2006, a warrant was issued for Gleason's arrest for violating the terms and conditions of his pretrial/sentencing release. I immediately scheduled a hearing, but it was delayed until Gleason could be transported from Ft. Knox, KY and later superseded by Judge Marbley's order, setting Gleason's sentencing date for November 8, 2006.

> In between Gleason's arrest and the date of his sentencing, I spoke with Gleason about the pre-trial release violations, via telephone, on October 25, 26, 27, & 31, 2006 and met with him for more than an hour, the day before sentencing at the Franklin County jail on November 7, 2006.

> During such conversations, I was not initially aware of the full extent of the violations (i.e., Gleason's use of internet and phone chat sites to meet females; his off post trysts and his attempts to persuade friends to lie in order to cover for him), because Gleason's account included only a small portion of what actually took place. Gleason told me only that he had ventured off the Ft. Knox reservation in order to attend a friend's retirement party and had stayed overnight at that person's because he had been drinking too much.

> Later, after receiving a copy of Pretrial Services October 25, 2006 violation report, I discussed its allegations with Gleason and he did not deny them. Even then, as late as November 7, 2006, he did not inform me of the full extent of his violations.

> The Assistant US Attorney did not tell me the Government

would be calling any witnesses until late afternoon, the day before the sentencing hearing. As such, I was unable to present any counter testimony at the hearing, except for Gleason's. I did not ask for a continuance, because Gleason, at the time the testimony was being presented, admitted that he had lied to David Spoelker, his pretrial release officer, concerning his actions and whereabouts and that the testimony of the Government witnesses was true.

Although I filed a Sentencing Memorandum addressing 18 U.S.C. §3553(a) considerations, I was unable to provide supporting documentation or witness testimony for mitigation purposes, due to the following reasons:

a. During the initial week of my representation, I advised Gleason to immediately seek counseling, and for months afterward, repeatedly reminded him that it would be in his best interest to do so. Such help was readily available, without cost to all military personnel stationed at the Ft. Knox Military Reservation, which has Ireland Army Community Hospital located on the Post.

b. Gleason told me that he did so, but on December 14, 2005, when I contacted Ronald Freeman, a licensed social worker who had been counseling sex offenders since 1998, he informed me that Gleason's visits were sporadic and few in number; that Gleason was evasive and not frank with him and that Gleason had not scheduled any visits with him for the past several months. Another call to U.S. Army Chaplain Major Stanley Harlow, similarly established that Gleason had only visited him on two or three occasions.

c. On January 23, 2006, the same day Gleason entered his guilty plea, I filed a motion to have Gleason psychiatrically evaluated. My request for psychiatric services was intentional, because I suspected at the time, that Gleason might be suffering from some sort of diminished capacity, possibly due to organic causes.

d.  On May 5, 2006, I withdrew the motion; partly because the Court had still not answered it; but mostly because by that time, after discussing the matter with Gleason, I had concluded there were broader aspects to his personality that a psychological evaluation might more appropriately address for 18 U.S.C. 3553(a) mitigation purposes.

e.  Before withdrawing the motion, I contacted Tenenbaum and Associates on April 27, 2006... and determine[d] that an evaluation would cost between $2.2K and 2.5K.  Because .. [t]he Court had still not responded to my previous motion, I advised Gleason that it would be a lot quicker if he could pay for the evaluation himself.  Gleason advised me that he could do so.

f.  In retrospect, I would have filed another motion and would have pursued a response from the Court more vigorously.  However on at least two occasions, Gleason wrote to advise me that he intended to come up with the money....

g.  Moreover, Gleason ignored my repeated warnings advising him of the importance of undergoing a psychological evaluation.... by failing to show up for his two scheduled appointments.... Gleason never advised me that he could not afford to pay for the evaluation.

On December 8, 2006, I filed a motion for the Court to reconsider its sentence.  After it was filed, I told Gleason's sister, Rosemary Wascak that his NCO Efficiency Report had not been included because I mistakenly thought that it was four years old.  As it turned out, the report was current, but it was the same one that Gleason had sent me several months prior, which I had previously decided not to use in my sentencing memorandum, because it was unsigned.  However, that report and three previous ones, were provided to psychologist Jeffrey Smalldon on July 24, 2006 for use as background information.

*Affidavit of Charles G. Kaps*.

Correspondence between petitioner and Kaps indicates that: On May 9, 2006, Attorney Kaps wrote petitioner that, under the terms of his pretrial release, he was permitted trips to and from Columbus, Ohio for purposes of a psychological evaluation. Petitioner was advised to contact Jeff Smalldon of Tennenbaum & Assoc. to set up an appointment as soon as possible. The evaluation would cost about $2,200 and should not exceed $2,500. Attorney Kaps requested petitioner to keep him informed of what was happening in regard to his psychological evaluation. In a letter dated June 20, 2006, petitioner wrote Kaps that he had $1,443.73 in his savings account and additional $600.00 in his checking account. He also indicated:

> I have now taken control of the money, and until I can account for where it went, I don't have the money for the doctor.

*Exhibits to Affidavit of Charles G. Kaps.* Petitioner needed a continuation of the sentencing hearing, so he would obtain military pension benefits and so he could get the money together to pay for psychological services by the end of July. *See id.* In a letter dated July 7, 2006, Kaps wrote petitioner that he would soon be preparing a motion to delay sentencing and advised him:

> John, I also can't stress enough the importance of getting you to undertake the psychological. I believe it is crucial for you to undergo it and it could make a huge difference in your sentence. Please keep in touch and let me know what is happening.

*See id.* On July 11, [2006], petitioner faxed Attorney Kaps that he needed the phone number

for the psychologist again, and indicated:

> Tell him I will send 1,000 on 1st of August, and balance on day
> of visit.  Did he come down to 2000.00 as we said?

*See id.*  On July 14, 2006, Attorney Kaps wrote petitioner advising him that he had filed a

motion to continue sentencing past October 13, 2006.

> Even if the Judge doesn't grant it (and I'm not saying he won't)
> it's important that you contact Tennenbaum for an
> appointment if you haven't done so already.  For a number of
> reasons, having a psychological report will be hugely beneficial
> for you in the future, even if it's too late for sentencing
> purposes.
>
> ***
>
> Let me know what transpires.

*See id.*  Jeffrey L. Smalldon, Ph.D., ABPP, wrote defense counsel in a letter dated September

27, 2006, as follows:

> Thanks for referring your client Sgt. John E. Gleason to me for
> evaluation.
>
> Unfortunately, I've been unable to perform the consultation
> that you envisioned.  Sgt. Gleason has cancelled scheduled
> appointments at least once (probably twice), and although he's
> repeatedly indicated that at least a portion of the requested
> deposit on retainer was forthcoming, we've never received any
> money from him.
>
> We had to cancel the appointment that was scheduled
> yesterday (Tuesday) because he hadn't returned our phone

calls and hadn't sent the partial deposit on retainer that he'd
assured us some weeks before would be arriving soon.

I'd still be happy to perform the evaluation if you need to have
it done – but we'd have to have at least a portion of Sgt.
Gleason's deposit on retainer in hand a minimum of ten days
before my first meeting with him.

*See id.*

Petitioner also indicated to the probation officer, who initially prepared the
PreSentence Investigation Report on February 23, 2006, that he had been seeing a
counselor, Robert Freedman in Fort Knox, Kentucky, since the date of the offense, and had
also been talking to his chaplain, Stan Harlow, in Fort Knox, on a weekly basis. *PreSentence
Investigation Report*, at ¶50.

Respondent contends that petitioner's claim that he was denied the effective
assistance of counsel at sentence may not be reviewed in these proceedings, because on
direct appeal the United States Court of Appeals for the Sixth Circuit rejected petitioner's
claim that he was improperly sentenced. *See United States v. Gleason, supra.* However,
petitioner asserts that, but for the inadequate performance of his attorney, he would have
received a lesser sentence. *See Petition; Traverse.* Such a claim of ineffective assistance of
counsel is properly addressed in these habeas corpus proceedings. Nonetheless, the
record indicates that petitioner has failed to establish the ineffective assistance of counsel
under *Strickland*.

It is well settled that "[c]ounsel has a duty to make reasonable investigations or to

make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Carter v. Bell*, 218 F.3d 581, 600 (6th Cir. 2000). The United States Court of Appeals for the Sixth Circuit has held that the failure to present mitigating evidence in a capital case at sentencing may constitute the ineffective assistance of counsel. *See Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000):

> See *Austin v. Bell,* 126 F.3d 843, 849 (6th Cir.1997) (holding that defense counsel's failure to investigate or present any mitigating evidence because counsel believed that it would be of no benefit constituted ineffective assistance of counsel when several witnesses were available and willing to testify on defendant's behalf, as the failure to present mitigating evidence undermined the adversarial process and rendered the death sentence unreliable); *Glenn v. Tate,* 71 F.3d 1204, 1206-08 (6th Cir.1995) (holding that counsel provided ineffective assistance when mitigating information was not presented to the jury at sentencing because counsel made virtually no attempt to prepare for sentencing phase). In *Austin,* we recognized that the failure to present mitigating evidence when it was available could not be considered a strategic decision, but rather, an "abdication of advocacy." 126 F.3d at 849.

*Id. See also Martin v. Mitchell*, 280 F.3d 594, 612 (6th Cir. 2002)(citations omitted). At least in capital cases, the scope of a court's review of a claim of ineffective assistance of counsel during mitigation is shaped by the degree of counsel's alleged inadequacies. "Our circuit's precedent has distinguished between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d at 643 (citing *Campbell v. Coyle*, 260

F.3d at 552, and *Moore v. Parker*, 425 F.3d at 255); *see also Sneed v. Johnson*, – F.3d –, 2010 WL

1223242 (6th Cir. March 31, 2010), *comparing Porter v. McCollum*, 558 U.S. –, 130 S.Ct. 447, 453

(2009)(performance deficient where "counsel did not even take the first step of

interviewing witnesses or requesting records") with *Bobby v. VanHook*, 558 U.S. –, 130 S.Ct.

13, 18-19 (2009)("holding performance not deficient when counsel gathered a substantial

amount of information and then made a reasonable decision not to pursue additional

sources"). Further, as previously discussed, the petitioner must also establish prejudice

from counsel's alleged deficiencies. *See Porter v. McCollum, supra, citing Strickland*, 466 U.S.

at 694. Petitioner has failed to meet this standard here.

The Federal Rules of Evidence do not apply at bond hearings or sentencing and

therefore hearsay testimony from Jennifer Chadwick was admissible at the hearing on

petitioner's violation of the terms of his pre-trial release and sentencing. *See* Federal Rule

of Evidence 1101(d)(3);[3] *United States v. Poulsen*, 2008 WL 928566 (S.D. Ohio April 7, 2008),

---

[3] Federal Rule of Evidence 1101 provides:

(d) Rules inapplicable. The rules... do not apply in the following
situations:

\*\*\*

(3) Miscellaneous proceedings. Proceedings for extradition
or rendition; preliminary examinations in criminal cases;
sentence, or granting or revoking probation; issuance of
warrants for arrest, criminal summonses, and search
warrants; and proceedings with respect to release on bail or
otherwise.

citing *United States v. Abuhamara*, 389 F.3d at 321; *United States v. Horvath*, 575 F.Supp. 516,

519-21 (D. Minn. 1983); *United States v. Shipman*, 215 F.3d 1328, unpublished, 2000 WL

687686 (6th Cir. May 15, 2000)(noting the same with regard to admission of hearsay at

sentencing). The United States Court of Appeals for the Second Circuit has noted:

> [E]ven in the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. *See United States v. LaFontaine,* 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." *United States v. Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir. 1985).... Indeed 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence....

*Abuhamra, supra,* 389 F.3d at 321 n.7; *see also United States v. Kirby*, 418 F.3d 621, 627-628 (6th

Cir. 2005)(reliable hearsay is admissible in revocation of supervised release

hearings)(citations omitted). Further, the record is without support for petitioner's

apparent contention that Spoelker would have offered any favorable testimony on his

behalf. To the contrary, petitioner admitted he was guilty of violating the terms of his pre-

trial release:

> A. [A]s far as the violations go, I take full responsibility. I panicked and lied. In fact, Mr. Spoelker told me if you'd have just come to me and told me, I would have probably let it slide. But I panicked, and it snowballed.

---

Fed. R. Ev. 1101(d)(3).

*Transcript*, November 8, 2006, at 47. Had defense counsel successfully been able to obtain a continuance of the hearing, the government may well have obtained the presence of Spoelker, Justin Pendleton, Jeremy Lowe, or Gabriella Bonafonte, who, from the record before this Court, would not have assisted the defense. *See Sentencing Transcript*, at 29-43. Additionally, the record does not reflect that counsel failed to prepare for sentencing. Contrary to petitioner's allegation here, defense counsel brought out on cross examination of Chadwick that petitioner did not explicitly violate the terms of his pre-trial release by engaging in a "phone chat service," or in having a relationship with an adult woman. *Id.*, at 15-16. Defense counsel likewise argued, as petitioner argues that he should have, that petitioner had observed the conditions of his pre-trial release for fifteen months. *Id.*, at 49:

> Even the violations he did, although they were, in fact, violations over the last two months in August and in September of the terms of the release, were not, in fact, illegal acts. ... I would simply say that with respect to the 15 months he did observe the terms of probation, his freedom was severely restricted and, in fact, he had electronic monitoring, which is a form of punishment which the guidelines themselves provide for.... with regards to 3553, ... his liberty for the past... 17 months, really has been severely restricted... it would be fair to consider that that be part of his punishment and sentence him accordingly.

*Id.*, at 49-50. Counsel also advised the Court that Mrs. Gleason had filed for divorce and the parties were in the process of divorce at that time. "For all practical purposes, they have been separated anyway for the last 17 months." *Id.*, at 61. Attorney Kaps filed a motion for downward departure of the sentencing guidelines. *See* Doc. No. 53.

Due to petitioner's pre-trial release conduct the District Court was unpersuaded that petitioner understood the ramifications of his criminal conduct and sentenced him above his recommended sentence under the United States Sentencing Guidelines.

> [COURT]: I don't know that given his post-offense and post-conviction behavior... that Mr. Gleason gets it. I don't know whether his post-offense behavior shows respect for the law or whether his post-offense behavior convinces me that this sentence adequately protects the public from further crimes of the defendant.

> I also don't know whether the – a sentence of 46 to 57 months will afford adequate deterrence to criminal conduct because of the behavior that I have seen in this case.

> ... [I]t appears to me that Mr. Gleason was continuing the same pattern that led to this underlying offense.

> The fact that he used a telephone chat room as opposed to the internet only tells me that he was clever enough not to use the internet, but he used a telephone chat room to achieve the same purpose.

> ... I have certainly departed downward when people have shown extraordinary post-offense or post-conviction rehabilitation.... [T]he same would hold true if someone displayed behavior that was inconsistent with any type of – not remorse so much as respect for the law or understanding of what he had done and the consequences of what he had done in the first instance....

*Id.*, at 62-63. Petitioner begged "the Court's mercy" and advised the District Court that he had only started "phone chats" in late July, but for 15 months had "lived to the letter" but "toward August" he received the notice of divorce from his wife. *Id.*, at 65-66.

38

Nonetheless, the Court imposed 78 months imprisonment. *Id.*, at 66-69. The fact that petitioner did not receive the sentence he hoped for simply fails to constitute the ineffective assistance of counsel.

The record supports Attorney Kaps' statement that petitioner indicated that he would attend counseling and pay for the cost of a psychological evaluation, and does not support petitioner's contention here, that he was unable to obtain any counseling reports in mitigation due solely to the ineffective assistance of counsel. *See discussion, supra*. Further, the record fails to support petitioner's claim that a psychological evaluation or counseling report would have assisted him, particularly in view of petitioner's pre-trial release violations that were considered by the District Court in imposing sentence.

Referring to *United States v. Cherry*, 487 F.3d 366 (6th Cir. 2007), petitioner argues that he was prejudiced by defense counsel's failure to obtain a favorable psychological or counseling report, because the United States Court of Appeals for the Sixth Circuit "has recognized the unavailability of sex disorder counseling in prison as a basis for downward departure." *See Traverse*, at 6. However, the facts in *Cherry* are not analogous to this case. In *Cherry, supra*, the Sixth Circuit affirmed the District Court's downward departure to 120 months incarceration under a recommended guideline range of 210 to 262 months on a criminal defendant charged with distributing, receiving, and possessing child pornography, where the defendant had entered counseling and an inpatient treatment center months prior to sentencing, and his therapist testified at sentencing that he "had taken responsibility for his actions and had progressed in therapy." *Id.*, at 368. In *Cherry,*

a second defense expert in sex offender evaluation and treatment also testified that the defendant "was in the lowest risk category for sexual offenders.... and was not a pedophile." *Id*.

Here, however, the record suggests that petitioner failed to avail himself of counseling services he could have readily obtained through his military service, despite the fact that he had ample time to do so during the lengthy period of time he remained on pre-trial release due to his attorney's success in obtaining continuances of his sentencing hearing at petitioner's request. As discussed, the record is without support for petitioner's contention that he was unable to obtain a favorable psychological evaluation solely because he could not afford to pay for such a report.

Similarly, aside from the *NCO Evaluation Report*, petitioner does not indicate, and the record does not reflect, the nature of any rebuttal evidence that would have assisted him. Review of the record fails to indicate that counsel's failure to introduce the *NCO Evaluation Report* at sentencing prejudiced petitioner within the meaning of *Strickland*. The District Court was well aware of petitioner's 20 years of honorable service in the United States military. *See, e.g., PreSentence Investigation Report*, at ¶53. In short, nothing in the record supports petitioner's contention that any of the actions or inactions complained of by defense counsel at sentencing would have assisted him in obtaining a lesser sentence.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.** Petitioner's request for an evidentiary hearing is **DENIED**.

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge